## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re Shields Health Care Group, Inc. Data Breach Litigation | Case No.: 1:22-cv-10901-PBS |
| | Leave to file with page extension granted on August 25, 2023 |
| | Leave to file with time extension granted on September 21, 2023 |

## PLAINTIFFS' OPPOSITION IN RESPONSE TO DEFENDANT SHIELDS' MOTION TO DISMISS

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 1

        A.      Plaintiffs' Experiences Following the Data Breach ................................. 5

III.    MOTION TO DISMISS STANDARD .............................................................. 8

IV.     ARGUMENT ....................................................................................................... 9

        A.      Plaintiffs Sufficiently State A Claim For Negligence ............................. 9

        B.      The Economic Loss Rule Does Not Bar Plaintiffs' Claim...................... 10

        C.      Plaintiffs and Class Members Have Alleged Cognizable Injuries ......... 13

        D.      Plaintiffs Have Sufficiently Pled Contract Claims ................................ 16

        E.      Plaintiffs Sufficiently Allege Breach of an Express Contract................. 17

        F.      Plaintiffs Sufficiently Allege Breach of an Implied Contract ................ 18

        G.      Plaintiffs Sufficiently Allege Breach of an Implied Covenant of Good Faith
                and Fair Dealing...................................................................................... 20

        H.      Plaintiffs Plausibly Allege Injury for All Three of Their Contract Claims ........... 20

        I.      Plaintiffs Sufficiently Allege Negligent Misrepresentation ................... 21

        J.      Plaintiffs Sufficiently Allege Invasion Of Privacy ................................ 22

        K.      Plaintiffs Sufficiently Allege Breach Of Fiduciary Duty....................... 24

        L.      Plaintiffs Sufficiently Allege Unjust Enrichment ................................. 25

        M.      The Rhode Island Deceptive Trade Practices Act Claim Is Sufficiently Pled ...... 26

        N.      The Maine Unfair Trade Practices Act Is Sufficiently Pled.................... 28

        O.      The Maine Confidentiality Of Health Care Information Law Claim Is
                Sufficiently Pled...................................................................................... 29

        P.      The New Hampshire Consumer Protection Act Claim Is Sufficiently Pled ......... 31

        Q.      The New Hampshire Notice Of Security Breach Claim Is Sufficiently Pled ....... 32

        R.      The Massachusetts Consumer Protection Act Claim Is Sufficiently Pled ........... 32

## **TABLE OF AUTHORITIES**

**Cases**

*Alberts v. Devine,*
    395 Mass. 59 (Mass. 1985) ....................................................................................... 24

*Amato v. Dist. Att'y for Cape & Islands Dist.,*
    952 N.E. 2d 400 (Mass. App. Ct. 2011) ................................................................... 23

*Amoche v. Guar. Tr. Life Ins. Co.,*
    556 F. 3d 41 (1st Cir. 2009) ...................................................................................... 29

*Anderson v. Hannaford Bros. Co.,*
    659 F.3d 151 (1st Cir. 2011) ........................................................................... 18, 19, 28

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678 (2009) ............................................................................................ 8

*Axford v. TGM Andover Park, LLC,*
    No. 19-cv-11540-ADB, 2021 WL 681953 (D. Mass. Feb. 22, 2021) ....................... 22

*Barnes v. Town of Webster,*
    No. 042420, 2005 WL 2864801 (Mass. Super. Oct. 11, 2005) ................................. 23

*Billingham v. Dornemann,*
    853 N.E.2d 220, 2006 WL 2490204 (Mass. App. Ct. 2006) ..................................... 34

*Bohnak v. Marsh & McLennan Cos., Inc.,*
    79 F.4th 276 (2d Cir. 2023) ...................................................................................... 16

*Bosque v. Wells Fargo Bank, N.A.,* 762 F. Supp. 342, 354 (D. Mass. 2011)762 F. Supp.
    2d 342 (D. Mass. 2011) ............................................................................................. 33

*Cook v. WHDH-TV, Inc.,*
    No. 941269, 1999 WL 1327222 (Mass. Super. Mar. 4, 1999) ................................. 23

*DeWolfe v. Hingham Ctr., Ltd.,*
    985 N.E.2d 1187 (Mass. 2013) .................................................................................. 21

*Dieffenbach v. Barnes & Noble, Inc.,*
    887 F.3d 826 (7th Cir. 2018) .............................................................................. 15, 28

*Donovan v. Philip Morris USA, Inc.,*
    455 Mass. 215, 914 N.E.2d 891 (2009) .................................................................... 15

*Farmer v. Humana, Inc.*,
  582 F. Supp. 3d 1176 (M.D. Fla. 2022) ................................................................... 15

*Garweth Corp. v. Boston Edison Co.*,
  415 Mass. 303 (1993) ................................................................................................ 10

*Global Investors Agent Corp. v. Nat'l Fire Ins. Co. of Hartford*,
  76 Mass. App. Ct. 812 (Mass. App. Ct. 2010) ......................................................... 26

*Grafton Partners, LLC v. Barry & Foley Motor Transp., Inc.*,
  No. 200400039A, 2007 WL 1418529 (Mass. Super. Apr. 9, 2007) ......................... 22

*Helfman v. Northeastern Univ.*,
  149 N.E. 3d 758 (Mass. 2020) ................................................................................... 14

*Hermida v. Archstone*,
  950 F. Supp. 2d 298 (D. Mass. 2013) ....................................................................... 33

*In re Anthem, Inc. Data Breach Litig.*,
  No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016) .................. 14

*In re Capital One Consumer Data Sec. Breach Litig.*,
  488 F. Supp. 3d 374 (E.D. Va. 2020) ........................................................................ 26

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
  660 F. Supp. 2d 94 (D. Me. 2009) ............................................................................ 28

*In re Marriott Int'l, Inc.*,
  440 F. Supp. 3d 447 (D. Md. 2020) ........................................................................... 17

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
  613 F. Supp. 3d 1284 (S.D. Cal. 2020) ............................................................... 15, 32

*In re TJX Cos. Retail Sec. Breach Litig.*,
  564 F.3d 489 (1st Cir. 2009) ............................................................................ 10, 11, 12

*In re: Netgain Tech., LLC*, 21-CV-1210 (SRN/LIB),
  2022 WL 1810606 (D. Minn. June 2, 2022) ............................................................. 14

*Laccinole v. Appriss, Inc.*,
  453 F. Supp. 3d 499 (D.R.I. 2020) ("*Laccinole* I") ................................................... 27

*Laccinole v. Gulf Coast Collection Bureau, Inc.*,
  No. CV 22-223-JJM-LDA, 2023 WL 157719 (D.R.I. Jan. 11, 2023) ...................... 27

*Lynch v. Conley*,
  853 A.2d 1212 (R.I. 2004) ......................................................................................... 28

*Maio v. TD Bank, N.A.*,
  2023 WL 2465799 (D. Mass. Mar. 10, 2023) ............................................................. 10

*McCormick v. Lischynsky*,
  2019 WL 3429242 (D. Mass. July 30, 2019) ............................................................. 10

*Monks v. Astoria Bank*,
  No. CV 16-12084-FDS, 2017 WL 2435278 (D. Mass. June 5, 2017) ....................................... 21

*Patane v. Nestle Waters N. Am., Inc.*,
  478 F. Supp. 3d 318 (D. Conn. 2020)........................................................................ 28

*Piccuirro v. Gaitenby*,
  480 N.E.2d 30 (Mass. App. Ct. 1985) ....................................................................... 34

*Polay v. McMahon*,
  10 N.E.3d 1122 (Mass. 2014) ............................................................................... 24

*Portier v. NEO Tech. Sols.*,
  No. 3:17-CV-30111-TSH, 2019 WL 7946103 (D. Mass. Dec. 31, 2019), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020)................................................................................................. 11, 13, 14

*Price Chopper, Inc. v. Consol. Beverages, LLC*,
  No. 09-10617-FDS, 2011 WL 90187 (D. Mass. Mar. 11, 2011) ............................................ 19

*Richards v. Arteva Specialties S.A.R.L.*,
  850 N.E.2d 1068 (Mass. App. Ct. 2006) ............................................................... 33, 35

*Rodi v. S. New England Sch. Of L.*,
  389 F.3d 5 (1st Cir. 2004)................................................................................ 33

*Sackin v. Transperfect Glob., Inc.*,
  278 F. Supp. 3d 739 (S.D.N.Y. 2017)....................................................................... 15

*Santagate v. Tower*,
  833 N.E. 2d 171 (Mass. App. Ct. 2005) .................................................................... 25

*Schlesinger v. Merrill Lynch Pierce, Fenner & Smith, Inc.*,
  567 N.E. 2d 912 (Mass. 1991) ............................................................................. 24

*Shedd v. Sturdy Mem'l Hosp. Inc.*,
  No. 2173-cv-00498C, 2022 WL 1102524 (Mass. Super. Apr. 5, 2022) ............................. passim

*Tallent v. Liberty Mut. Ins. Co.*,
  No. CIV.A. 1997-1777H, 2005 WL 1239284 (Mass. Super. Apr. 22, 2005)............................... 34

*Veridian Credit Union v. Eddie Bauer, LLC*,
  295 F. Supp. 3d 1140 (W.D. Wash. 2017) ............................................................................. 31

*Walker v. Boston Med. Ctr. Corp.*,
  33 Mass. L. Rptr. 179 (Mass. Super. Ct. 2015) ........................................................................ 16

*Wash. Trust Advisors, Inc. v. Arnold*,
  Civil Action No. 22-11847-PBS, 2022 U.S. Dist. LEXIS 224165 (D. Mass. 2022) ................ 17

*Webb v. Injured Workers Pharmacy, LLC*,
  72 F.4th 365 (1st Cir. 2023) ...................................................................................... passim

*Weisenberger v. Ameritas Mut. Holding Co.*,
  597 F. Supp. 3d 1351 (D. Ne. 2022) ....................................................................................... 32

*Weld v. CVS Pharmacy, Inc.*,
  10 Mass. L. Rptr. 217, 1999 WL 494114 (Mass. Super. Ct. 1999) ................................... 24, 25

*Williams v. Perrault*,
  976 N.E.2d 214, 2012 WL 4936612 (Mass. App. Ct. 2012) .................................................... 35

*Zabilansky v. Am. Bldg. Restoration Prod., Inc.*,
  No. 200101985, 2004 WL 2550458 (Mass. Super. Oct. 13, 2004), *aff'd*, 853 N.E.2d 221
  (Mass. App. Ct. 2006) ........................................................................................................... 35

*Zoll Medical Corp. v. Barracuda Networks, Inc.*,
  585 F. Supp. 3d 128 (D. Mass. 2022) ..................................................................................... 20

**Statutes**

22 ME. STAT. tit. 22, § 1711-C ........................................................................................... 29, 30

CAFA, Pub. L. No. 109-2, § 2(b), 11 Stat 4 (2005) ................................................................. 29

MASS. GEN. LAWS ch. 214, § 1B ........................................................................................... 22

MASS. GEN. LAWS ch. 93A, § 9(3) ........................................................................................ 32

N.H. REV. STAT. ANN. § 358-A:2 ........................................................................................... 31

N.H. REV. STAT. ANN. § 359-C:20(I)(a) ................................................................................. 32

Rhode Island Deceptive Trade Practices Act, R.I. GEN. LAWS §§ 6-13.1-1 .............................. 27

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 8, 10

## I.   __INTRODUCTION__[1]

Plaintiffs seek to hold Defendant Shields Health Care Group ("Shields" or "Defendant") accountable for its inadequate data security, which resulted in a serious data breach injuring two million patients nationwide – sick patients who received MRI and other medical imaging services to diagnose illness (the "Data Breach").[2]   Plaintiffs and Class Members allege they were harmed when Defendant failed to maintain its computer systems adequately and failed to discover cybercriminals were hacking its computer systems and accessing patients' personally identifiable health and other highly-sensitive and confidential information ("PII," "PHI," and "Private Information").   Indeed, Shields received and inadequately investigated a security alert while the cyberattack was taking place and failed to stop it.   Defendant does not challenge Plaintiffs' Article III standing, nor could it under *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365 (1st Cir. 2023).   In fact, Defendant does not challenge that Plaintiff Buechler suffered injury as an element of his claims.   Plaintiff Buechler suffered actual fraud after the Data Breach through, *inter alia*, unauthorized charges made by cybercriminals on his payment card.   The other named Plaintiffs have also suffered cognizable injuries under their claims, as addressed herein.   Defendant's challenges to the Complaint should be rejected.[3]

## II.   __STATEMENT OF FACTS__

Plaintiffs bring this class action on behalf of all persons in the United States, other than Massachusetts residents, whose Private Information was compromised in the Data Breach from

---

[1] Plaintiffs are voluntarily dismissing the following claims:   Negligence Per Se; Breach of Confidence; Declaratory Judgment; Maine Uniform Deceptive Trade Practices Act; Maryland Consumer Protection Act, Maryland Personal Information Act, and Maryland Social Security Number Privacy Act.

[2] This action is on behalf of class members who reside outside of the Commonwealth of Massachusetts. Residents of the Commonwealth are represented by counsel in Massachusetts State Court.

[3] To the extent any claims are dismissed by the Court, Plaintiffs respectfully request leave to amend.

approximately March 7, 2022 to March 21, 2022.  *See* Consolidated Class Action Complaint ("Complaint"), ¶ 168.[4]  In the alternative, Plaintiffs bring this class action on behalf of the state sub-classes of Maine, Rhode Island, and New Hampshire.  *Id.* ¶ 169. Shields provides MRI, PET/CT, and ambulatory outpatient surgical services at facilities throughout New England and to patients in neighboring states.  ¶ 1.[5]

The nature of its healthcare services requires Shields to store patients' Private Information in its system, which it maintains electronically.  ¶ 31.  From approximately March 7, 2022 to March 21, 2022, unauthorized computer hackers were able to infiltrate Shields' computer system and steal Plaintiffs' and Class Members' Private Information, which the hackers then offered for sale to other cybercriminals on the dark web. ¶ 33.  An investigation by Shields revealed that some two million patients were affected by the Data Breach.  ¶ 34.  According to Shields, the following Private Information was amongst that stolen: patients' full name, Social Security number, date of birth, home address, provider information, diagnosis, billing information, insurance number and information, medical record number, patient ID, and other medical or treatment information.  ¶ 35. To make matters worse, Shields failed to notify Plaintiffs and the Class Members of the Data Breach within 60 days as required by law and instead waited three to four months from its discovery.  ¶¶ 35, 38.  Incredibly, as per the Data Breach Notice, "Shields had identified and investigated a security alert on or around March 18, 2022" but was unable to confirm the data theft "at that time." ¶ 37.  As such, the Data Breach was able to continue through March 21, 2022.

---

[4] All references to the Complaint are cited as "¶ __."

[5] Shields provided health care services in, *inter alia*, Massachusetts, Maine, Maryland, Rhode Island, and New Hampshire, and also reported sending notice of the Data Breach to patients who reside in, among other states, Texas, Vermont, Washington, Indiana, California, Oregon, and Montana, among others.  *See* ¶ 1.

Shields' Privacy Practice statement on its website states that it considers it Shields' responsibility as a provider to "[m]aintain the privacy of [its customers'] health information as required by law." ¶ 101.  It describes how it may use and disclose medical information but nowhere states it has a right to expose patients' Private Information to unauthorized persons as occurred here.  ¶ 102.  Numerous organizations have publicly warned about data security in the healthcare industry, including the Federal Bureau of Investigation and the American Medical Association. ¶¶ 104-05.  Notably, the healthcare sector reported the second largest number of privacy breaches among all sectors in 2018 and the stolen information is among the most sensitive.  ¶ 107.  Simply put, the Data Breach was foreseeable, and Shields knew or should have known of the importance of safeguarding its patients' Private Information.   ¶ 109.   Private Information is a valuable commodity to identity thieves, ¶ 115, and PHI is particularly valuable, including to make false insurance claims, purchase medical equipment, or gain access to prescription drugs for illegal use or resale.  ¶ 117.  Once Private Information is stolen, people can be victimized for years.  ¶ 120.

Shields' actions also violated HIPAA, which requires covered entities to protect against reasonably anticipated threats to the security of PHI.  ¶ 124.  As noted above, Sheilds violated the HIPAA Breach Notification rule by failing to provide notice of the Data Breach "without unreasonable delay and in no case later than 60 days following discovery of a breach."  ¶ 126.  In addition, Shields failed to comply with safeguards required by HIPAA regulations, Federal Trade Commission guidelines, and various healthcare industry standards.  ¶¶ 127, 128-34, 135-38.

The Data Breach was a direct and proximate result of Shields' failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access, use, and disclosure, including as required by industry practices and various laws; (b) establish and implement appropriate administrative, technical, and physical safeguards to

ensure the security and confidentiality of Plaintiffs' and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

¶ 155.  Plaintiffs and Class Members have been placed at an imminent and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.  ¶ 158.

As a result of Defendant's failures to prevent and then provide timely notice of the Data Breach, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of suffering:

    i.      The compromise, publication, theft and/or unauthorized use of their Private Information;

    ii.     Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    iii.    Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    iv.    The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Private Information in its possession;

    v.     Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

    vi.    Anxiety and distress resulting from fear of misuse of their medical information.

¶ 161.  Plaintiffs and Class Members also have an ongoing interest in ensuring their Private Information remains secure and is not subject to further misappropriation and theft.  ¶ 162.

### A.      Plaintiffs' Experiences Following the Data Breach

Plaintiff **James Buechler** is a patient of Baystate Health Urgent Care in Longmeadow, Massachusetts, where he has had imaging.   ¶ 41.[6]   After receiving the Data Breach Notice, Buechler spent at least 10 to 15 hours dealing with the consequences of the Data Breach and continues to do so (and plans to do so in the future), including reviewing and monitoring his bank accounts, credit card accounts, and other online accounts.   ¶¶ 44-45.   Buechler did so in part because he experienced identity fraud through unauthorized charges on his Bank of America card, which caused him to be without it for three days.   ¶ 47.   He was thus forced to use his Bank of America business payment card, which had a lower percentage cash back discount.   It further caused him to experience bookkeeping issues to repay his business for the personal charges; and disable and re-link his automatic payments.   *Id*.   Moreover, AOL froze his primary email account containing highly sensitive financial account information after detecting fraudulent activity.   ¶ 48.

As a result of the Data Breach, Buechler suffered lost time, annoyance, interference, and inconvenience, time Mr. Buechler otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life (¶ 50), as well as emotional distress (¶ 51).   He suffered actual injury in the form of fraudulent charges to his Bank of America card, as well as lost benefits and discounts and time spent on bookkeeping issues associated with same. He also purchased identity theft protection, which costs him $299 per year.   ¶ 54.   In addition, he suffered actual injury in the form of damages to and diminution of the value of Private Information – a form of intangible property that Plaintiff entrusted to Defendant for the purpose of receiving medical services, which was compromised in, and as a result of, the Data Breach.   He also suffered

---

[6] The Complaint contains a scrivener's error as to where Plaintiff Buechler was treated, mistakenly stating it was Mercy Hospital when it was, in fact, Baystate Health Urgent Care in Longwood, Massachusetts.  .

actual injury in the form of lost time by having to deal with all the consequences of the Data Breach, as discussed above. *Id.*

Plaintiff **Julie Colby** was utilizing Shields imaging in Topsham, Maine for years and on December 15, 2021, went to Shields for a chest x-ray. ¶ 55. She received a Data Breach Notice in June 2022. ¶ 57. Thereafter, she spent time to mitigate the impact of the Data Breach, including diligently checking her accounts and financial accounts, time she otherwise would have spent on other activities or leisurely events. ¶ 58. After the Data Breach, Colby was subject to a potential fraud in which a caller was attempting to reach her about her health insurance plan. ¶ 59. Upon research, she determined the calls were a scam by someone who likely had information about her health insurance plan. *Id.* She has also received an increase in spam telephone calls. ¶ 60. Colby has suffered emotional distress, including anxiety, concern and unease due to the Data Breach. ¶ 61. Colby suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to: (a) paying monies to Shields for its goods and services which she would not have paid had Shields disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information – a form of intangible property that Plaintiff entrusted to Shields as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft. ¶ 62.

Plaintiff **John Kennedy** received a Data Breach Notice in July 2022. ¶ 64. After receiving it, Kennedy spent at least 10 hours dealing with the consequences and continues to spend many hours (and plans to do so in the future), including reviewing and monitoring his bank accounts, credit card accounts, credit reports and other online accounts, reviewing dark web alerts, and researching the potential impact of the Data Breach. ¶¶ 67. This is time he otherwise would have

spent on other activities, such as his job and leisure activities.  ¶ 71.  Kennedy has also experienced unwanted "phishing" correspondence, including several calls each day, which he has tried to block. ¶ 70.  Kennedy has suffered lost time, annoyance, interference, and inconvenience, as well as emotional distress, due to the Data Breach.  ¶¶ 71-72.  Plaintiff suffered actual injury in the form of damages to and diminution of the value of Private Information – a form of intangible property that Plaintiff entrusted to Defendant for the purpose of receiving medical services, which was compromised in, and as a result of, the Data Breach.  ¶ 75.  In addition, Kennedy has suffered actual injury in the form of lost time by having to deal with the consequences of the Data Breach, as described above.  *Id.*

Plaintiff **Sharon Pimental** has been a patient of Shields for approximately three years. ¶ 76.  She received the Data Breach Notice after June/July 2022.  ¶ 78.  Thereafter, she spent time dealing with its consequences and continues to do so, including reviewing and monitoring her bank accounts, credit card accounts, credit reports and other online accounts, researching the potential impact of the Data Breach, and evaluating freezing her credit with credit reporting agencies and credit protection services.  ¶ 80.  This is time she otherwise would have spent on other activities, such as her job and leisure activities.  ¶ 84.  She has also now been receiving unwanted "phishing" correspondence, including calls regarding solicitation from medical companies for medical equipment and devices.  ¶ 83.  Pimental has suffered lost time, annoyance, interference, and inconvenience, as well as emotional distress, because of the Data Breach.  ¶¶ 84-85. Plaintiff suffered actual injury in the form of damages to and diminution of the value of Private Information – a form of intangible property that Plaintiff entrusted to Defendant for the purpose of receiving medical services, which was compromised in, and as a result, of the Data Breach.  ¶ 88.  In addition, Pimental has suffered actual injury in the form of lost time by having to deal with the consequences

of the Data Breach, including reviewing and monitoring her bank accounts, credit card accounts, credit reports and other online accounts, researching the potential impact of the Data Breach, evaluating freezing her credit with credit reporting agencies and credit protection services, and dealing with an increase in spam calls. *Id.*

Plaintiff **Cindy Tapper** has been a patient of Shields for approximately one year. ¶ 89. She received the Data Breach Notice after July 2022. ¶ 91. Thereafter, Tapper spent some five hours dealing with its consequences and continues to spend many hours on same (and plans to do so in the future), including reviewing and monitoring her bank accounts, credit card accounts, credit reports and other online accounts, researching the potential impact of the Data Breach, and evaluating freezing her credit with credit reporting agencies and credit protection services. ¶ 93. This is time she otherwise would have spent on other activities, such as her job and leisure activities. ¶ 96. Tapper has suffered lost time, annoyance, interference, and inconvenience, as well as emotional distress, due to the Data Breach. ¶¶ 96-97. Plaintiff Rapper also suffered actual injury in the form of damages to and diminution of the value of Private Information – a form of intangible property that she entrusted to Defendant for the purpose of receiving medical services, which was compromised in, and as a result of, the Data Breach. ¶ 100. In addition, Tapper has suffered actual injury in the form of lost time by having to deal with the consequences of the Data Breach, as described above. *Id.*

## III.   MOTION TO DISMISS STANDARD

On a Rule 12(b)(6) motion, all well-pled non-conclusory factual allegations are taken as true, and all reasonable inferences are granted in the plaintiffs' favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[7] To survive the motion to dismiss, if accepted as true, the factual matter

---

[7] For all citations, unless otherwise indicated, footnotes and internal citations are omitted.

would state a claim that is plausible on its face.  *Id.*  If the court can draw a reasonable inference that the defendant is liable for the alleged misconduct, the claim is facially plausible.  *Id.* Plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  As shown below, these standards have been met here.

IV.   **ARGUMENT**

A.     **Plaintiffs Sufficiently State A Claim For Negligence[8]**

Defendant makes two arguments for dismissal of Plaintiffs' negligence claim:  that the economic loss doctrine bars the claim and that the Plaintiffs other than Buechler do not allege they suffered an actual loss.  *See* MTD at 7-10.   Neither has merit.

Recently, the First Circuit reversed in part and remanded a district court's ruling dismissing the plaintiffs' common law claims regarding a similar data breach based on standing grounds.  *See Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365 (1st Cir. 2023).  In *Webb*, the defendant home-delivery pharmacy service collected patients' PII, including names, Social Security numbers, dates of birth, financial information, credit cards, health insurance, prescriptions, diagnoses, treatments, healthcare providers, and Medicare/Medicaid IDs as a condition to receiving services.  *See id.* at 369-70.  Hackers breached the defendant's systems and stole PII that included patient names and Social Security numbers.  *Id.* at 370.  The defendant performed a seven-month investigation before notifying patients and implemented new data safeguards during that time.  *Id.*  The First Circuit held that while actual misuse of one plaintiff's PII easily constituted a concrete injury for standing purposes, *id.* at 374, even though the complaint did not allege actual misuse for the other plaintiff, it plausibly alleged "a concrete injury in fact based on the material

---

[8] Defendant applies Massachusetts law to each of the common law claims.  Plaintiffs do not disagree that, for purposes of this motion, the Court can and should evaluate the claims under Massachusetts law.

risk of future misuse of [her] PII and a concrete harm caused by exposure to this risk" sufficient to find Article III standing. *Id.* On remand, the district court ruled on the defendant's arguments under Rule 12(b)(6) and upheld numerous claims, including the negligence claim for which it rejected similar arguments asserted here. *See Webb v. Injured Workers Pharmacy, LLC*, Civ. Action No. 22-cv-10797, 2023 WL 5938606 (D. Mass. Sept. 11, 2023).[9]

**B.      The Economic Loss Rule Does Not Bar Plaintiffs' Claim**

In *Webb*, 2023 WL 5938606, at *3, the court on remand rejected the same economic loss rule argument as Defendant asserts here:

> Finally, plaintiffs' negligence claim is not barred by the economic loss doctrine. Although precedential cases almost uniformly hold that only a tangible physical injury to person or property can overcome the economic loss doctrine's bar, *see, e.g., In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498-499 (1st Cir. 2009); *Garweth Corp. v. Boston Edison Co.*, 415 Mass. 303, 305 (1993), other (non-precedential) cases have held that the "personal injury" can be satisfied by a claim of emotional distress, *see McCormick v. Lischynsky*, 2019 WL 3429242, at *5 (D. Mass. July 30, 2019). [footnote omitted] Here, at the pleading stage, plaintiffs have alleged sufficient non-monetary harm, including palpable emotional distress, sufficient to satisfy the "personal injury" exception to the economic loss doctrine. *See Maio v. TD Bank, N.A.*, 2023 WL 2465799, at *4 (D. Mass. Mar. 10, 2023) (allegations of "lost sleep, anxiety, and depression" were sufficient to overcome motion to dismiss negligence claim on economic loss doctrine grounds).

Like *Webb*, Plaintiffs here have alleged sufficient non-monetary harm, including emotional distress, annoyance, unease, anxiety and increased concerns, to preclude application of the economic loss doctrine. *See, e.g.*, ¶¶ 50-51 (Buechler); ¶ 61 (Colby); ¶¶ 71-72 (Kennedy); ¶¶ 84-85 (Pimental); ¶¶ 96-97 (Tapper).

---

[9] Under Massachusetts law, "[t]o prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." *Jupin v. Kask*, 849 N.E.2d 829, 834-35 (Mass. 2006). "Whether there is a duty to be careful is a question of law, which [a court may] determine by reference to existing social values and customs and appropriate social policy." *Id.* at 832.

As in *Webb*, 2023 WL 5938606, at *3, the Court should reject Defendant's reliance on *In re TJX*, 564 F.3d 489. "[T]he legal landscape concerning liability for data breaches and identity theft is substantially different than it was when *[In re TJX]* . . . [was] decided [over] ten years ago[.]" *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111-TSH, 2019 WL 7946103 at *18 (D. Mass. Dec. 31, 2019), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020). *Portier* found that Massachusetts is among the states "that permit recovery for economic losses in data breach cases" and it upheld the negligence claim "based on the theft and misuse of employees' PII that they entrusted to their employer as a condition of employment." *Id.* at *18, *22.[10] This case presents analogous facts of Plaintiffs entrusting their PII as a condition of treatment by Shields.[11]

In *Portier*, 2019 WL 7946103, at *20-22, the court declined to apply the economic loss doctrine to a data breach involving the disclosure of highly sensitive personal employee information that included Social Security numbers. The court found the employer defendant owed a common law duty, independent of any duty under a contract, to the employee plaintiffs and that the defendant employer should have reasonably foreseen the harm that befell the employees. *See id.* at *20-21. This approach was also adopted in *Shedd v. Sturdy Mem'l Hosp. Inc.*, No. 2173-cv-00498C, 2022 WL 1102524, *7-8 (Mass. Super. Apr. 5, 2022), where a Massachusetts court, relying on *Portier*, refused to dismiss a claim based in negligence, finding the economic loss doctrine not appropriate for a hospital data breach that disclosed highly sensitive personal information of its patients. The *Shedd* court found there was a special relationship under the

---

[10] *Portier* noted that Massachusetts courts have declined to apply the economic loss doctrine if the source of the duty breached arises independent of a party's contractual obligations and in situations where the tort claim arises against a fiduciary. *See id.* at *19, *21. Each is separately satisfied here.

[11] The court should also reject Defendant's reliance on out-of-circuit cases from nearly 10 years ago. *See* MTD at 8-9.

circumstances "where patients [were] required to provide highly sensitive PII to a hospital to obtain medical care, are powerless to protect that information but rely on the hospital to do so consistent with state and federal law, and the hospital should reasonably have foreseen and guarded against the risk of disclosure." *Id.* at *8.

Here, Shields, as a healthcare provider, has a common law duty to secure, maintain, protect, and safeguard the PII and PHI it collects and stores from its current and former patients against unauthorized third-party access and disclosure. ¶ 32. Shields recognizes that duty as evidenced by its Privacy Practice statement in which it expressly undertakes the obligation to "[m]aintain the privacy of your health information as required by law." ¶ 101. Shields' privacy policy describes how it may use and disclose medical information for categories of uses, none of which provide it a right to expose patients' Private Information in the manner it was exposed to unauthorized third parties in the Data Breach. ¶ 102. Shields' duties arise independent of a contractual relationship with Plaintiffs. [12] As in *Shedd*, Plaintiffs and the Class Members are patients who tendered their PII and PHI as a condition for receiving healthcare services, are "powerless to protect that information" and must rely on Shields to safeguard their highly sensitive personal and medical information. *Shedd,* 2022 WL 1102524, at *8.

Based on the parties' relationship as patients and healthcare provider, Shields and Plaintiffs share a special relationship. Shields was at all relevant times aware that PII and PHI it collects and stores from Plaintiffs and the Class is highly sensitive and of significant value to those who would use it for the wrong purposes. ¶ 114. Shields collected Plaintiffs' and Class Members' name, Social Security number, date of birth, home address, provider information, diagnosis, billing

---

[12] *TJX* involved a credit card agreement, which constitutes another reason why *TJX* does not apply regarding the economic loss rule. *See* 564 F.3d at 499.

information, insurance number and information, medical records numbers, patient IDs, and other medical or treatment information.  ¶ 35. Shields "reasonably could foresee that [it was] expected to take affirmative action to protect [P]laintiff[s] and could anticipate harm to the [P]laintiff[s] from the failure to do so." *Portier*, 2019 WL 7946103, at *21; *accord Shedd*, 2022 WL 1102524, at *8 ("In those circumstances, there may well be a 'special relationship' eliminating the application of the economic loss doctrine.").

### C.    Plaintiffs and Class Members Have Alleged Cognizable Injuries

Defendant concedes that Plaintiff Buechler has sufficiently alleged injury.  As such, because the economic loss doctrine does not preclude his claims, *see supra*, Plaintiff Buechler has stated a claim for negligence.  However, all of the other Plaintiffs have also sufficiently alleged injury for their negligence claims.  In *Webb*, the district court ruled on remand that the plaintiffs sufficiently alleged injury for their negligence claims, holding that "[t]he Complaint also plausibly alleges that the data breach and the resulting injuries to plaintiffs were foreseeable results of IWP's failure to implement sufficient security safeguards, and that but for IWP's failure, plaintiffs would not have been harmed."  2023 WL 5938606, at *2.  Specifically, the court stated (*id.*):

> In marshalling their alleged harms, plaintiffs state that: (1) they have "spent considerable time and effort monitoring [their] accounts to protect [themselves] from additional identity theft"; (2) they suffer from some combination of feelings of rage, anxiety, fear, sleep disruption, stress, and physical pain; (3) they have suffered "damages to and diminution in the value of [their] PII"; (4) an unauthorized user used Ms. Webb's PII, including her name and Social Security Number, in an unspecified manner; (5) an "unknown and unauthorized third-party" filed a 2021 tax return using Ms. Webb's name, causing her to spend "considerable time" communicating with the IRS; and (6) plaintiffs "remain at continued risk of harm due to the exposure and potential misuse of their personal data by criminal hackers." Compl. ¶¶ 82-101. These factual allegations of harm taken together limn a plausible case that plaintiffs were harmed by IWP's breach of its duty.

Here, as in *Webb*, 2023 WL 5938606, at *2, Plaintiffs have all alleged that the breach and resulting injuries were the foreseeable result of Shields' failure to implement sufficient security measures and but for that failure they would not have been harmed.  *See* ¶¶ 146-166.  They allege

that: they each spent considerable time and effort to monitor their accounts following the Data Breach[13]; they have each suffered from emotional distress, annoyance, unease, anxiety and increased concerns[14]; they have each suffered damages to and diminution in the value of their PII[15]; some had unauthorized uses of their PII; and they remain at risk of harm due to exposure and potential misuse of their PII by the hackers.  *See* ¶¶ 41-100.  These allegations taken together plausibly allege Plaintiffs were harmed by Shields' breach of its duty.  *See Webb*, 2023 WL 5938606, at *2.

Like *Webb*, 2023 WL 5938606, at *2, other courts have similarly recognized that mitigation efforts result in compensable damages.  *See, e.g.*, *In re: Netgain Tech., LLC*, 21-CV-1210 (SRN/LIB), 2022 WL 1810606, at *13–14 (D. Minn. June 2, 2022); *Farmer v. Humana, Inc.*,

---

[13] Defendant's contention that Plaintiffs failed to "assign a monetary value to their time," rendering these allegations of lost time "vague and not a measurable loss," MTD at 9, ignores the allegations, which are sufficiently detailed at the pleading stage.  *See Webb*, 2023 WL 5938606, at *2 (upholding claim based on "considerable time and effort").  Assignment of a specific monetary value is not required and Defendant misreads *Portier* in this regard, which instead held that "the value of a considerable amount of time spent in seeking to prevent or undo the harm caused by the misuse of PII" is sufficient to state a negligence claim. 2019 WL 7946103, at *16.  Nonetheless, Plaintiffs did describe in detail the time they spent after the Data Breach to deal with its consequences.  *See* ¶¶ 58-59. 67-68. 80, 84, 93.  Moreover, this was time spent "at Shields' direction" as per the notice it sent which said to "review[ ] your account statements and monitor[ ] your credit reports for suspicious activity or errors."  *See, e.g.*, ¶ 68.

[14] Defendant's argument that for negligent infliction of emotional distress, a plaintiff is required to prove some "'physical harm manifested by objective symptomology' and 'that a reasonable person would have suffered emotional distress under the circumstances,'" MTD at 10, is inapposite as that is an entirely different tort not asserted here.  In fact, in Defendant's cited case, *Helfman v. Northeastern Univ.*, 149 N.E. 3d 758, 767, 776 (Mass. 2020), the court analyzed negligence separately from negligent infliction of emotional distress and stated that the elements of negligence are as noted *supra* at n.9.  The court in *Webb* did not utilize that standard in analyzing the plaintiffs' negligence claims and instead held that "some combination of feelings of rage, anxiety, fear, sleep disruption, stress, and physical pain" was sufficient, as alleged here.  2023 WL 5938606, at *2.  Nonetheless, Plaintiffs have alleged "sufficient physical harm manifested by objective symptomology" and that a reasonable person would have suffered emotional distress under those circumstances.  *See* ¶¶ 41-100; *see also* ¶¶ 146-166.

[15] Contrary to Defendant's contention that diminution in value and risk of future harm are not cognizable injuries, MTD at 9-10, *Webb* found that they are, as shown *supra*.  2023 WL 5938606, at *2; *see also, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *15 (N.D. Cal. May 27, 2016) (upholding allegations of injury that plaintiffs' PII is a "valuable commodity," the theft of which reduces its value).

582 F. Supp. 3d 1176, 1186 (M.D. Fla. 2022) (finding damages when a consumer whose PII and PHI were exposed in a data breach suffered damages where he spent time dealing with the consequences of the breach and incurred substantially increased risk of fraud and identity theft); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1296 (S.D. Cal. 2020) ("Increased time spent monitoring one's credit and other tasks associated with responding to a data breach have been found by others courts to be specific, concrete, and non-speculative."); *Sackin v. Transperfect Glob., Inc.*, 278 F. Supp. 3d 739, 749 (S.D.N.Y. 2017) (plaintiff's "mitigation expenses satisfy the injury requirements for negligence").  A contrary rule would penalize parties for taking beneficial actions to reduce risks by denying them the right to seek redress.  *See, e.g.*, *Sackin*, 278 F. Supp. 3d at 749 ("[M]itigation expenses satisfy the injury requirements of negligence; otherwise Plaintiffs would face an untenable Catch–22 . . . Plaintiffs were required to take reasonable steps to mitigate the consequences of the data breach; they could not passively wait for their identities and money to be stolen.").[16]

Like *Webb*, 2023 WL 5938606, at *2, other courts also recognize that future harm is a cognizable injury and is sufficient to survive dismissal for a data breach.  In *Shedd,* the trial court recognized that the "[damages] tort law 'developed in the late Nineteenth and early Twentieth centuries,' and that the Court must 'adapt' to permit compensation for injury which should be compensable even if the full effects are not immediately apparent." 2022 WL 1102524, at *6 (quoting *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 914 N.E.2d 891 (2009)) (finding allegations of future harm sufficient and denying motion to dismiss in a hospital data breach).  The

---

[16]  The First Circuit in *Webb* held that lost time following a data breach was a sufficient concrete injury to allege standing under Article III, citing favorably to decisions holding "that the opportunity cost of 'one's own time needed to set things straight' following a data breach 'can justify money damages, just as [it] support[s] standing.'" 72 F.4th at 377 (quoting *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018)).

*Shedd* court held that the plaintiffs' allegations that they faced the risk of identity fraud in the future because their private information remained on the dark web were sufficient injury to state negligence, breach of fiduciary duty, and contract claims (all alleged here). *Id.* at *4-6. The *Shedd* court analogized that case to *Walker v. Boston Med. Ctr. Corp.*, 33 Mass. L. Rptr. 179, 180 (Mass. Super. Ct. 2015), where the court rejected a similar argument of failure to plead injury where the defendant hospital's patients' medical records had been exposed to the public. The *Shedd* court held that "'Plaintiff's general allegation of injury from the data breach, inferring, as I do, that there likely was or will be access to plaintiffs' confidential medical information by unauthorized persons, is sufficient.'" *Shedd*, 2022 WL 1102524, at *5 (quoting *Walker*, 33 Mass. L. Rptr. at 180).

Like the *Shedd* defendant, Shields allowed unauthorized third-party disclosure of PII and PHI that could be used to target victims in frauds, scams, or medical identity theft. ¶¶ 117–118. Once stolen, criminals can cause significant damage to victims for years and fraudulent activity may not show up for six months to a year or longer. ¶ 120. The Second Circuit recently held that the plaintiff's "alleged injury arising from the increased risk of harm is cognizable for standing purposes, and thus could support a claim for damages," especially where the plaintiff "has pled additional injuries – the time and money spent trying to mitigate the consequences of the data breach – with respect to which damages are unquestionably capable of reasonable proof." *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 290 (2d Cir. 2023). As in the foregoing cases, Plaintiffs' allegations, taken together, suffice to allege injury.

### D.    Plaintiffs Have Sufficiently Pled Contract Claims

Defendant contests all three contractual claims: breach of express contract, breach of implied contract, and breach of the implied covenant of good faith and fair dealing. Defendant asserts that "the Complaint does not allege a valid express or implied contract between [Plaintiffs] and Shields regarding data security" and "Plaintiffs did not suffer damages as a result of the

Incident."  MTD at 11-12.  These arguments fail as Plaintiffs have sufficiently alleged a contract (*see infra* at Sections II.A-C) as well as injury (*see infra* at Section II.D).

### E.    Plaintiffs Sufficiently Allege Breach of an Express Contract

To state a claim for breach of contract under Massachusetts law, a plaintiff must establish that "(1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result."  *Wash. Trust Advisors, Inc. v. Arnold*, Civil Action No. 22-11847-PBS, 2022 U.S. Dist. LEXIS 224165, *13 (D. Mass. 2022).  Defendant only contests the first and fourth elements but is incorrect in both instances.

Plaintiffs adequately allege the existence of an express agreement between the parties. ¶¶ 101-103.  Defendant promised as part of its Privacy Practice statement on its website that it is Shields' responsibility to "[m]aintain the privacy of your health information as required by law." ¶ 101.  The Privacy Practice statement also described how Shields may use and disclose medical information for each category of uses or disclosures, none of which provide it a right to expose patients' Private Information in the manner it was exposed in the Data Breach.  ¶ 102.  The express terms of the agreement between the parties were thus clear.  Privacy statements have been held to be sufficiently specific for a breach of contract claim in similar data breach cases.  *See, e.g., In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 483-84 (D. Md. 2020) (denying motion to dismiss express contract claims under New York and Maryland law based on "alleged contracts formed by Marriott and Starwood's privacy statements" as they "constitute objective offers to protect the personal information that it collects under the terms of the privacy statements").

**F.      Plaintiffs Sufficiently Allege Breach of an Implied Contract**

Contrary to Defendant's contention, the existence of an implied contract is plausibly alleged.[17]  As courts in the First Circuit have found in other data breach cases, an implied contract exists between plaintiffs and a defendant where the plaintiffs provide the defendant with private information in order to conclude their transaction and there is thus an implicit agreement that the defendant will safeguard the data.  *See Anderson v. Hannaford Bros. Co.,* 659 F.3d 151, 159 (1st Cir. 2011).  As the Court in *Anderson* held:

> [A] jury could reasonably find an implied contract between [defendant] and its customers that [defendant] would not use the [sensitive] data for other people's purchases, would not sell the data to others, and would take reasonable measures to protect the information. . . . When a customer uses a credit card in a commercial transaction, she intends to provide that data to the merchant only.  Ordinarily, a customer does not expect—and certainly does not intend—the merchant to allow unauthorized third-parties to access that data.  A jury could reasonably conclude, therefore, that an implicit agreement to safeguard the data is necessary to effectuate the contract.

*Id.* at 158-59.  While *Anderson* was decided under Maine law, this reasoning applies with equal force under Massachusetts law and in the medical context, like here, where Social Security numbers, for instance, are at least as sensitive and cannot be canceled or changed when compared with the credit and debit card information at issue in *Anderson*.[18]  Indeed, the *Anderson* court's holding refutes Defendant's contention that "[t]here is also no basis to find an implicit agreement merely by Plaintiffs providing their information in a consumer transaction," MTD at 12, especially given the promises made by Shields in its Privacy Practice statement.  There was thus an implied promise that Shields, as a healthcare provider requiring that customers provide it with PII to get service, would safeguard that private information.  The court in *Shedd* similarly upheld a breach

---

[17] "An implied contract 'may be inferred from (1) the conduct of the parties and (2) the relationship of the parties.'"  *Webb*, 2023 WL 5938606, at *3.

[18] "[T]he risk of future misuse may be heightened where the compromised data is particularly sensitive."  *Webb*, 72 F.4th at 376.

of implied contract claim under facts analogous to those present here.  *See* 2022 WL 1102524, at *10 ("When a patient hands over sensitive information to receive medical care, they expect an implicit assurance that the information will be protected.   In the absence of cases in the Commonwealth (state or federal) addressing this issue, namely whether there can be an implied contract by a hospital to safeguard PII disclosed by patients, on this record and stage of the proceeding, dismissal is not appropriate.").

Defendant's assertion that "Shields' privacy policies do not evidence an agreement to provide data security, but merely a statement that Shields takes privacy 'seriously,'" MTD at 12, is not credible as it ignores the plain language of those promises posted on Shields' website and would be an impermissible inference in Defendant's favor.  The case on which Defendant relies is inapposite.  *Price Chopper, Inc. v. Consol. Beverages, LLC*, No. 09-10617-FDS, 2011 WL 90187, *5 (D. Mass. Mar. 11, 2011), was not a data breach case.   Rather, it involved a dispute between a supermarket chain and distributor of alcoholic beverages in which the court found the parties had entered into an implied contract because their "actions manifested agreement to enter into a business relationship wherein plaintiff accepted, redeemed, and resold empty containers for defendant in exchange for reimbursement and a fee."  *Id.*  at *1, *5.  And *Anderson*, *supra*, a data breach case, was decided by the First Circuit after *Price Chopper*.  As such, *Anderson* is applicable here over *Price Chopper* and compels the conclusion that Plaintiffs have sufficiently alleged an implied contract.[19]

---

[19] In *Webb*, on remand, the district court held there was no implied contract because there were no promises by IWP to safeguard the information.  *See* 2023 WL 5938606, at *3 ("While the Complaint adequately alleges that plaintiffs had a good faith belief that their PII would be protected by IWP, there was no allegation that IWP agreed – explicitly or implicitly – to provide such protection.").  Here, there were such promises in Shields' Privacy Practice statement posted on its website wherein Shields expressly stated it was its own responsibility to "[m]aintain the privacy of your health information as required by law."  ¶ 101.

### G.     Plaintiffs Sufficiently Allege Breach of an Implied Covenant of Good Faith and Fair Dealing

Defendant contends that Plaintiffs' allegations that Shields breached a covenant of good faith and fair dealing fail because they "do not suggest any bad faith and are vague and conclusory." MTD at 12.  This contention is incorrect.  For example, it took Shields three to four months after the Data Breach to inform Plaintiffs and Class Members, resulting in Plaintiffs and Class Members suffering harm they otherwise may have been able to avoid had Shields notified them of the Data Breach sooner.  *See, e.g.*, ¶¶ 36-38.  Plaintiffs further allege that Shields' Notice was "deficient, failing to provide basic details concerning the Data Breach."  ¶ 39.  These allegations state sufficient facts at this stage to reflect Shields failed to act in good faith.[20]

### H.     Plaintiffs Plausibly Allege Injury for All Three of Their Contract Claims

As with the negligence claim, Defendant concedes that Plaintiff Buechler has sufficiently alleged injury for all his breach of contract claims.  Defendant's argument that Plaintiffs Colby, Kennedy, Pimental and Tapper failed to allege injury is without merit.  For all the reasons stated *supra* at Section I.B that these Plaintiffs have alleged sufficient injury for their negligence claim, they have also stated injury for their contract claims.  For example, they spent considerable time and effort to monitor their accounts following the Data Breach; they suffer from emotional distress, annoyance, unease, anxiety and increased concerns; they have suffered damages to and diminution in the value of their PII; there were unauthorized uses of their PII; and they remain at risk of harm due to exposure and potential misuse of their PII by hackers.  *See* ¶¶ 41-100, 146-166.

---

[20] Defendant cites *Zoll Medical Corp. v. Barracuda Networks, Inc.*, 585 F. Supp. 3d 128, 138 (D. Mass. 2022) for the proposition that the defendant's performance must lack good faith.  *See* MTD at 12.  *Zoll* supports Plaintiffs because the court upheld allegations that the defendant breached the covenant of good faith and fair dealing by, *inter alia*, failing to inform the plaintiff of the breach for more than one week and providing an explanation that understated the breach's scope and severity.  585 F. Supp. 3d at 138.  These are similar to Plaintiffs' allegations here.  *See, e.g.*, ¶¶ 38-39.

## I.     Plaintiffs Sufficiently Allege Negligent Misrepresentation

Defendant argues that Plaintiffs' negligent misrepresentation claim fails because it never represented it would "maintain adequate data privacy and security practices and procedures." MTD at 13 (quoting ¶ 224).   Apparently realizing that this is not true in light of Plaintiffs' allegations of specific representations that Defendant makes to its patients on its website, including that is obligated to, and presumably does, "[m]aintain the privacy of your health information as required by law" in Shields' Privacy Practice statement (¶ 101) and how it can use the personal information shared by patients (¶ 102), Defendant asserts that the website "does not represent that Shields had any particular level of data security practices."  MTD at 13.  But Defendant does not cite any case that requires such quantification.

Indeed, Defendant's own citation shows that for this element, the only requirement is that it "supplied false information for the guidance of others." MTD at 13 (quoting *Monks v. Astoria Bank*, No. CV 16-12084-FDS, 2017 WL 2435278, at *6 (D. Mass. June 5, 2017)).  Implicit in the representations Defendant made on its website is the patient's understanding that the confidentiality of patient information would be maintained, at least in part, by implementing adequate and reasonable data security measures, which did not occur.  *See, e.g.*, ¶¶ 101-103, 224. "The critical question is whether the [defendant] 'failed to exercise reasonable care or competence in obtaining or communicating the information.'" *DeWolfe v. Hingham Ctr., Ltd.*, 985 N.E.2d 1187, 1192-93 (Mass. 2013), which lack of reasonable care Plaintiffs have alleged.  While Defendant contends that Plaintiffs have failed to identify warnings sufficient to put Defendant on notice of the threat, this is not true.  *See* ¶¶ 37 (Data Breach Notice advised Class Members that Defendant failed to detect the cyber security attack despite a security alert on March 18, 2022 and the Data Breach continued until March 21, 2022); 104-09 (describing various ways in which Defendant was put on notice of the threat of insufficient data security, including warnings by the FBI and

American Medical Association regarding the healthcare industry).  Thus, Plaintiffs' allegations suffice at the pleading stage.  *Grafton Partners, LLC v. Barry & Foley Motor Transp., Inc.*, No. 200400039A, 2007 WL 1418529, at *3 (Mass. Super. Apr. 9, 2007) ("Negligent misrepresentation is not a claim that must be pled with specificity.").[21]

### J.       Plaintiffs Sufficiently Allege Invasion Of Privacy

Defendant argues that Massachusetts does not recognize a claim for invasion of privacy under common law.  *See* MTD at 14.  However, under Defendant's own case law, Massachusetts "'recognizes an actionable right of privacy' under the privacy statute."  *Axford v. TGM Andover Park, LLC*, No. 19-cv-11540-ADB, 2021 WL 681953, *13 (D. Mass. Feb. 22, 2021).[22]  As the court noted in discussing MASS. GEN. LAWS ch. 214, § 1B, "'[T]he Legislature appears to have framed the statute in broad terms so that the courts can develop the law thereunder on a case-by-case-basis….'"  *Id.* (alteration in original).  And while "it is not fully settled which theories are actionable under the privacy statute, the public disclosure of private facts is explicitly recognized as a viable cause of action and intrusion upon seclusion appears to be at least impliedly recognized."  *Id.*  Here, Plaintiffs have alleged both.

Plaintiffs' claim for public disclosure of private facts is sufficiently pled because they allege there was a "gathering and dissemination of information which [they contend] was private."  *Shedd*, 2022 WL 1102524, at *11.  Plaintiffs allege that Defendant gathered Plaintiffs' confidential personal information (including names, addresses, dates of birth, Social Security numbers, and protected health information), and by failing to implement proper data security, disclosed and

---

[21] Defendant concedes that Plaintiff Buechler has sufficiently alleged injury for his negligent misrepresentation claim but refers the Court to its arguments on negligence in support of its contention that the other Plaintiffs have not alleged injury.  *See* MTD at 13.  That contention fails for the same reasons as stated *supra* in Section I.B for negligence.

[22] To the extent necessary, Plaintiffs can amend the Complaint to add reference to the statute.

disseminated at least some of that information to identity thieves, resulting in substantial interference with Plaintiffs' privacy rights. *See, e.g.*, ¶¶ 7-14, 149, 155-57. Defendant's sole retort is that the claim should fail "because the Incident was the result of third parties' unauthorized conduct" and thus it did not disseminate or affirmatively disclose the PII. MTD at 14. However, Defendant cites no cases to support its argument. Moreover, Sheilds is incorrect that it cannot be liable for invasion of privacy where another party disseminated the information because either "disclosure or dissemination" can support this claim. *See Amato v. Dist. Att'y for Cape & Islands Dist.*, 952 N.E. 2d 400, 409 (Mass. App. Ct. 2011). In fact, *Shedd* expressly refutes Defendant's argument because the court declined to dismiss a claim for invasion of privacy where "Plaintiffs allege[d] that unauthorized persons gained access to their personal and highly confidential information due to [defendant's] inadequate, negligent, and/or intentionally insufficient security measures." 2022 WL 1102524, at *11.

Similarly, with respect to a claim for intrusion upon seclusion, Defendant's sole argument is that Plaintiffs have failed to allege intent. *See* MTD at 14-15. However, Plaintiffs do not need to establish intent. *See, e.g.*, *Barnes v. Town of Webster*, No. 042420, 2005 WL 2864801, at *1 (Mass. Super. Oct. 11, 2005) (denying a motion to dismiss because "[t]he plaintiff should have an opportunity to develop his theory of negligent invasion of privacy"); *see also Shedd*, 2022 WL 1102524, at *11 (upholding invasion of privacy allegations that defendant's security measures were "inadequate, negligent and/or intentionally insufficient"). Rather, even under Defendant's own case law, to sustain a claim for intrusion upon seclusion, Plaintiffs need only demonstrate that "the defendant['s] conduct was unreasonable or unjustified and that the conduct amounted to a serious or substantial interference with [their] privacy." *Cook v. WHDH-TV, Inc.*, No. 941269, 1999 WL 1327222, at *5 (Mass. Super. Mar. 4, 1999) (citing *Schlesinger v. Merrill Lynch Pierce*,

*Fenner & Smith, Inc.,* 567 N.E. 2d 912, 914 (Mass. 1991)); *see also Polay v. McMahon*, 10 N.E.3d

1122, 1126 (Mass. 2014) ("[W]hether an intrusion qualifies as unreasonable, as well as either

substantial or serious, presents a question of fact.").[23]  Plaintiffs satisfy this standard.

### K.     Plaintiffs Sufficiently Allege Breach Of Fiduciary Duty

Defendant argues that a fiduciary duty does not extend to the data breach context.  *See*

MTD at 15 (citing *Alberts v. Devine,* 395 Mass. 59, 69 (Mass. 1985)).  According to Defendant,

"the relationship between Shields and Plaintiffs, as it relates to data security, is no different than

any entity to which Plaintiffs might provide their PII/PHI in this context." *Id.*  However, the *Webb*

court sustained the plaintiffs' breach of fiduciary duty claim based on a data breach in an analogous

medical context where the defendant, a pharmaceutical home delivery service, had patient records

containing credit-card information, Social Security numbers, dates of birth, medical information,

and Medicare and Medicaid identification numbers that were breached.  *See Webb*, 2023 WL

5938606, at *1, *5.  The *Webb* court stated, "The Massachusetts Superior Court has twice

considered the issue whether the law imposes a fiduciary duty on a pharmacist to keep confidential

her patient's PII and has both times concluded that such a fiduciary relationship exists. …" *Id.* at

*5.  One of those cases on which *Webb* relied, *Weld v. CVS Pharmacy, Inc.*, 10 Mass. L. Rptr.

217, 1999 WL 494114 (Mass. Super. Ct. 1999), cites the very case cited by Defendant here to

---

[23] While *Webb* held that invasion of privacy is an intentional tort, and that the plaintiffs had failed to allege intentionality as they only alleged negligence, 2023 WL 5938606, at *4, Plaintiffs respectfully disagree. The *Webb* court cites, *inter alia, Elliot-Lewis v. Abbott Labs*, 378 F. Supp. 3d 67, 71 (D. Mass. 2019) for the proposition that invasion of privacy is an intentional tort.  However, this court clarified what could be sufficient to allege such intentionality as follows:  "Elliott-Lewis has alleged no facts that plausibly suggest that Abbott released her personal data intentionally *or that anyone unauthorized had access to it*." *Id.* (emphasis added).  Here, Plaintiffs do allege that unauthorized individuals had access to their PII, which would satisfy this element, and they also allege intentional conduct. *See, e.g.*, ¶ 149 ("As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiffs' and Class Members' Private Information as detailed above, and Plaintiffs are now at a heightened risk of identity theft and fraud.").

hold, in denying summary judgment on a breach of fiduciary duty, that "pharmacists, who share an analogous relationship [as physicians to] their customers in so far as private medical information is concerned, also owe a duty of confidentiality, breach of which may be actionable." *Weld*, 1999 WL 494114, at *5.   Finding the existence of a fiduciary duty for the defendant pharmaceutical home delivery service, the *Webb* court held that "the Complaint successfully alleges that IWP breached its duty to its patients to protect the confidentiality of the PII, and that the plaintiffs were harmed as a result."  *Webb*, 2023 WL 5938606, at *5.

The same allegations should be upheld here.  *See, e.g.*, ¶¶ 4, 9, 113, 147-48, 242-48; *see also Shedd*, 2022 WL 1102524, at *9 (finding allegations that the plaintiffs relied on the defendant to keep their personal information confidential sufficient to demonstrate a fiduciary duty at the pleading stage).  And finally, "[w]hether or not the relationship here was sufficient to give rise to a fiduciary duty cannot be decided on a Motion to Dismiss but, as it is so deeply fact specific, must await further development."  *Shedd*, 2022 WL 1102524, at *9.

### L.    Plaintiffs Sufficiently Allege Unjust Enrichment

"Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"  *Santagate v. Tower*, 833 N.E. 2d 171, 176 (Mass. App. Ct. 2005).  To state a claim for unjust enrichment under Massachusetts law, a plaintiff must show an unjust benefit, which will turn on the parties' reasonable expectations. *See Shedd*, 2022 WL 1102524, at *11.   Defendant argues that the Complaint fails to allege an unjust benefit because Shields was only paid for the health care services it provided to Plaintiffs, and data security was not part of these services.  *See* MTD at 18.  However, this mischaracterizes Plaintiffs' claim and ignores the Complaint's well-pled allegations.  Plaintiffs allege that "[t]he payments for healthcare services that Plaintiffs and Class Members paid (directly or indirectly) to Defendant should have been used by Defendant, in part, to pay for the administrative costs of

reasonable data privacy and security practices and procedures." ¶ 274. The use of reasonable and adequate data security is an inherent part of reasonable business practices and the failure to do so allows Defendant to unjustly profit from lack of reasonable investment.

This is confirmed by Defendant's own Privacy Practice statement on its website, stating that it is Defendant's responsibility to "[m]aintain the privacy of your health information as required by law." ¶ 101. A plausible interpretation of such a statement is that any monies needed to pay for such privacy protection were included by Defendant as part of the charge for services rendered and expended accordingly, which they were not. As such, Plaintiffs have alleged the unjust retention of a benefit by Defendant. *See, e.g.*, *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 413 (E.D. Va. 2020) (failure to secure party's data "can give rise to an unjust enrichment claim where a defendant accepts the benefits accompanying plaintiff's data and does so at the plaintiff's expense by not implementing adequate safeguards"). Whether this is a reasonable interpretation is not appropriate for decision on this motion. *See Shedd*, 2022 WL 1102524, at *11 ("Determination of the justness or unjustness of [defendant's] retention of funds paid, as Plaintiffs allege, in part for data security, cannot be decided on a motion to dismiss.").[24]

## M. The Rhode Island Deceptive Trade Practices Act Claim Is Sufficiently Pled

Defendant argues that the Complaint fails to allege that Plaintiffs Kennedy and Pimental are "consumers" within the meaning of the Rhode Island Deceptive Trade Practices Act, R.I. GEN.

---

[24] Defendant's citation to *Global Investors Agent Corp. v. Nat'l Fire Ins. Co. of Hartford*, 76 Mass. App. Ct. 812, 826 (Mass. App. Ct. 2010) (*see* MTD at 17-18) is inapposite as the plaintiff had failed to plead unjust enrichment as a claim rather than seeking it as a jury instruction. Moreover, although in *Webb,* 2023 WL 5938606, at *4, on remand the court dismissed the unjust enrichment claim, Plaintiffs respectfully disagree. The statements here that Shields made on its website that it was Shields' responsibility as a provider to maintain the privacy of the health information plausibly give rise to a reasonable inference that any monies needed to pay for such privacy protection were included by Defendant as part of the charge for services rendered and expended accordingly. As such, Plaintiffs have sufficiently alleged an unjust benefit retained by Defendant based upon the parties' reasonable expectations.

LAWS §§ 6-13.1-1, et. seq. ("R.I. DTPA").  *See* MTD at 18.   Defendant also contends that Shields

is entitled to statutory safe harbor protection.  *Id.* at 18-19.  Defendant is wrong on both counts.

First, the R.I. DTPA does not define "consumer." Courts interpreting the statute give great

weight and consideration to the FTC's interpretations of Section 5(a) of the FTC Act, *see Laccinole*

*v. Appriss, Inc.*, 453 F. Supp. 3d 499, 506 (D.R.I. 2020) ("*Laccinole* I"), and also interpret the

statutory reference to "consumer" with a "common sense understanding of the word that

encompassed economic activities like purchasing and utilizing commercial goods or services." *Id.*

However, unlike in *Laccinole I*, where the court rejected the plaintiff's conclusory description of

himself as a consumer where he failed to assert that he purchased goods or services, *id.*, Plaintiffs

Kennedy and Pimental have alleged that they "conferred a monetary benefit on Defendant in the

form of payments made for the purchase of health care services."  ¶ 272; *see also* ¶ 228

("[Plaintiffs] would not have purchased health services from Defendant and would not have

entrusted their Private Information to Defendant" if they had "known of Defendant's inadequate

data privacy and security practices[.]"). Plaintiffs Kennedy and Pimental thus sufficiently allege

their roles as consumers of health care services and allege they were deceived in connection with

their purchase.  *Cf Laccinole v. Gulf Coast Collection Bureau, Inc.*, No. CV 22-223-JJM-LDA,

2023 WL 157719, at *4 (D.R.I. Jan. 11, 2023) (dismissing the plaintiff's R.I. DTPA claim where

he failed to "allege that he was deceived in connection with the purchase of a service or that he

was deceived as a consumer in connection with the purchase of a service").

Defendant is similarly unable to invoke the R.I. DTPA's safe harbor exception. The

specific acts at issue here—inadequate data privacy and security practices in connection with a

purchase of health care services—are not monitored or regulated by any governmental agency, as

is required for the exemption to apply.  *See Patane v. Nestle Waters N. Am., Inc.*, 478 F. Supp. 3d

318, 353 (D. Conn. 2020) ("The party claiming this exemption must 'demonstrate that the general activities complained of are subject to monitoring or regulation by a state or federal government agency,' after which 'the burden shifts to the party seeking to enforce the 'R.I. DTPA] to establish that the specific acts at issue are not covered by the exemption.'"); *Lynch v. Conley*, 853 A.2d 1212, 1214 (R.I. 2004). Defendant has failed to make a showing that would shift the burden to Plaintiffs and, in any case, neither the FTC Act, which is intended to protect consumers from unfair practices, nor HIPAA, which is intended to safeguard patient confidential private health information from disclosure without adequate consent or protections, were promulgated or enforced to regulate the specific conduct challenged here. As such, Plaintiffs Kennedy and Pimental's claims are not subject to the R.I. DTPA safe harbor exception.

### N.     The Maine Unfair Trade Practices Act Is Sufficiently Pled

Defendant argues that Plaintiff Colby's allegations of damages, including lost time, emotional distress, diminution in value of her PII, and an increase in spam telephone calls are not recoverable under the Maine Unfair Trade Practices Act ("UTPA"), citing *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 660 F. Supp. 2d 94, 102 (D. Me. 2009) and *Anderson*, 659 F.3d at 161. *See* MTD at 19-20. The *Anderson* court stated that the UTPA's "text requires that the plaintiff suffer a loss of money or property as a result of the unlawful act." 659. F.3d at 161; *see also In re Hannaford Bros.*, 660 F. Supp. 2d at 102. However, the First Circuit recently considered similar allegations that plaintiffs spent considerable time and effort monitoring their accounts to protect themselves from identity theft following the data breach at issue and explained that the "loss of this time is equivalent to a monetary injury, which is indisputably a concrete injury," and noted that "the opportunity cost of 'one's own time needed to set things straight' following a data breach 'can justify money damages[.]'" *Webb*, 72 F.4th at 376-77 (quoting *Dieffenbach*, 887 F.3d at 828). Plaintiffs respectfully submit that this recent ruling by the First

28

Circuit suggests that the allegations of Plaintiff Colby's "loss of time that would otherwise have been put to profitable use," *id.* at 377 n.8, including that she "spent time taking action to mitigate the impact of the Data Breach," which involved diligently checking her accounts and dealing with scam calls purportedly concerning her health insurance plan, plead actionable damages under the UTPA. *See* ¶¶ 58–60.

### O.   The Maine Confidentiality Of Health Care Information Law Claim Is Sufficiently Pled

Defendant contends that Plaintiff Colby failed to allege violations of the Maine Confidentiality of Health Care Information Law ("CHCIL"), 22 ME. STAT. tit. 22, § 1711-C, because (1) the claim was wrongly brought in federal court in Massachusetts, not "the Superior Court located where the disclosure occurred," as the statute requires; (2) the Complaint demands damages which are not permitted under the statute; and (3) the Complaint fails to allege that Defendant "released, transferred, or provided" the information because it concedes it was stolen by unauthorized persons and was thus not intentional as required under the statute. *See* MTD at 21-22. All three contentions fail.

First, under the Class Action Fairness Act of 2005 ("CAFA"), the claims here cannot be brought in state court but instead must be brought in federal court. *See* CAFA, Pub. L. No. 109-2, § 2(b), 11 Stat 4, 5 (2005); *see also Amoche v. Guar. Tr. Life Ins. Co.*, 556 F. 3d 41, 47-48 (1st Cir. 2009). Moreover, the statute states that the action may be brought "in the Superior Court in the county in which the individual resides or the disclosure occurred." 22 ME. STAT. tit. 22, § 1711-C(13)(B). Defendant presents no analysis as to where "the disclosure occurred" and the Complaint states that the company is based, and stores the PII at its facility, in Massachusetts. *See* ¶¶ 26, 31. Second, the statute permits "costs and a forfeiture or penalty under Paragraph C." 22 ME. STAT. tit. 22, § 1711-C(13)(B). At trial, Plaintiffs will only seek the available remedies under the statute.

Third, Shields' argument that the Complaint does not allege Shields' intent fails.  The CHCIL provides, in part, that health care information is confidential and may not be disclosed other than to the patient except in limited circumstances not applicable here.  The statute defines "disclosure" as the "release, transfer of or provision of access to health care information in any manner obtained as a result of a professional health care relationship between the individual and the health care practitioner or facility to a person or entity other than the individual." 22 ME. STAT. tit. 22, § 1711-C(1)(B). The statute further provides that an individual "aggrieved by conduct in violation of this section may bring a civil action against a person who has intentionally unlawfully disclosed health care information." *Id.* at § 1711(C)(13)(B).

The Complaint's allegations satisfy these elements.  Shields made active and deliberate choices concerning the security and integrity (and lack thereof) of its computer systems which failed to maintain "the confidentiality, security and integrity" of its patients' PII and "allowed hackers to improperly access and copy private health care information."  ¶ 328. Additionally, affirmative actions of Shields in maintaining the security of its computer systems at such inadequate levels allowed hackers to improperly access and copy private health care information of Plaintiff Colby and the Maine Sub-Class. ¶ 328.  As such, Shields actively, deliberately, and affirmatively allowed the hackers to see and obtain the health care information of Plaintiff Colby and the Maine Sub-Class Members.  *Id.*  These allegations are sufficient to viably claim that the disclosure of Plaintiff Colby's and the Maine Sub-Class' health care information, which was foreseeable to Shields, was intentional by virtue of Shields' deliberate actions and choices as to how to secure that highly sensitive information. The exact nature and extent of Shields' actions (including the intentional nature thereof) need factual development during discovery, which has not yet commenced.  But at the pleading stage, no more is required.

**P.      The New Hampshire Consumer Protection Act Claim Is Sufficiently Pled**

Defendant argues that the failure to maintain adequate data security measures is not an unfair or deceptive act or practice under the New Hampshire Consumer Protection Act ("N.H. CPA").  *See* MTD at 25.  However, like other state consumer protection statutes, the N.H. CPA contains a broad definition of what is prohibited:  "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce."  N.H. REV. STAT. ANN. § 358-A:2; *see, e.g., Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1161–62 (W.D. Wash. 2017) (finding plaintiff adequately pled a violation of the Washington Consumer Protection Act, which prohibits "'[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce,'" as the allegation that defendant "failed to take proper measures to protect account information of credit and debit card holders with respect to its POS and data security systems" constituted an "unfair act" under the statute).  The failure to maintain adequate data security easily fits within this broad definition and Shields presents no credible support for the proposition that the New Hampshire legislature did not intend to protect consumers in their state from data breaches using the New Hampshire Consumer Protection Act. While Defendant contends the list in the statute of what is prohibited does not contain data security practices (*see* MTD at 25), the language of the statute explicitly says the list "shall include, but is not limited to, the following." N.H. REV. STAT. ANN. § 358-A:2.  In any event, as alleged in the Complaint, Shields' actions fall within at least sections V ("Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"); VII ("Representing that goods or services are of a particular standard, quality or grade … if they are of another"); and IX ("Advertising good or services with intent not to sell them as advertised"); *see also* ¶¶ 370, 373.  Shields presents no authority for its position that it needed to represent "it had particular data security practices or procedures."  MTD at 25.

31

**Q.     The New Hampshire Notice Of Security Breach Claim Is Sufficiently Pled**

Defendant contends that the Complaint fails to allege why three months was unreasonable to investigate and notify consumers under the New Hampshire Notice of Security Breach statute ("N.H. NSB"), N.H. REV. STAT. ANN. § 359-C:20(I)(a).  *See* MTD at 26.  Shields discovered the Data Breach on March 28, 2022, but Plaintiff Tapper did not receive a Data Breach Notice until sometime after July 26, 2022 (which is approximately four months). ¶ 91.   Under the statute, Defendant was required to "notify the affected individuals as soon as possible" of the Data Breach. N.H. REV. STAT. ANN. § 359-C:20(I)(a).  New Hampshire courts have yet to interpret the term "as soon as possible."  However, the federal courts have interpreted similar statutes with the same "as soon as possible" phrase as the N.H. NSB.  For example, in *Weisenberger v. Ameritas Mut. Holding Co.*, 597 F. Supp. 3d 1351, 1364-65 (D. Ne. 2022), the court upheld allegations at the pleading stage that three months was not "as soon as possible" to notify the plaintiff and the class about a data breach as per that language in the Nebraska Data Protection Act.  *See also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1300 (S.D. Cal. 2020) (explaining that the issue of timeliness for notice of security breach is better suited for motion for summary judgment than motion to dismiss).[25]   Accordingly, the N.H. NSB claims should be sustained.

**R.     The Massachusetts Consumer Protection Act Claim Is Sufficiently Pled**

Defendant's challenges to the sufficiency of Plaintiffs' written demand for relief pursuant to MASS. GEN. LAWS ch. 93A, § 9(3), are misplaced.  First, Defendant claims that Plaintiffs'

---

[25] There is nothing in the N.H. NSB that significantly distinguishes it from these other state statutes. Thus, there is no reason why Defendant's need for nearly four months to investigate the data breach would be more reasonable under the N.H. NSB than the actions of other similarly situated defendants under similar state statutes.

demand dated September 30, 2022 (ECF No. 87, Ex. 1) (the "Consolidated Demand Letter") (Feldman Decl. Ex. A), was insufficient because it did not identify "Plaintiffs who had not yet been named in any of the consolidated actions."  MTD at 27-28.  Courts have rejected this argument. In *Bosque v. Wells Fargo Bank, N.A.*, the defendant claimed that a written demand served by one named Plaintiff "did not adequately describe the particularized injuries of the remaining five plaintiffs…." 762 F. Supp. 2d 342, 354 (D. Mass. 2011).  The court disagreed, holding that "a demand letter that identifies the particularized injuries of one class representative claimant and gives notice to defendant of the pendency of the class action is sufficient." *Id.*  The argument was rejected again in *Hermida v. Archstone*, 950 F. Supp. 2d 298, 305 (D. Mass. 2013), where the court held that once a defendant had notice of the pendency of a class action, "other members of the class could have joined the action without a new demand letter."[26]  *Id.* (collecting cases); *accord Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068, 1074 (Mass. App. Ct. 2006).

Here, the Consolidated Demand Letter specified that it was a "putative class action" brought on behalf of Plaintiffs and "all absent putative class members." Feldman Decl. Ex. A. Plaintiffs further specified that they intended to "assert claims on behalf of the Class," identified the injuries that "Plaintiffs and the Class have suffered and continue to suffer," and demanded that Defendant provide relief to "Plaintiffs and the Class."  *Id.* at 2.  This was sufficient to notify Defendant.  That other class members were later joined as named plaintiffs in the Complaint does nothing to undermine the sufficiency of the written demand.

---

[26] For this reason, Defendant's arguments regarding the letter sent by Plaintiff Colby are of no moment. Plaintiff Colby's individual complaint has since been superseded by the operative Complaint.  The Consolidated Demand Letter thus encompasses Plaintiff Colby's claims.  *See also Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 20 (1st Cir. 2004) ("Massachusetts courts typically have allowed plaintiffs to amend in order to cure this kind of modest pleading defect.").

Defendant next claims that the written demand did not sufficiently identify Plaintiffs' injuries and requested relief.  *See* MTD at 28.  But a written demand need only "make the cause and extent of the injury reasonably apparent to the defendant." *Billingham v. Dornemann*, 853 N.E.2d 220, 2006 WL 2490204, at *2 (Mass. App. Ct. 2006); *Tallent v. Liberty Mut. Ins. Co.*, No. CIV.A. 1997-1777H, 2005 WL 1239284, at *10 (Mass. Super. Apr. 22, 2005) (written demand need only allow defendant "to understand what injury the plaintiff has suffered").

In the Consolidated Demand Letter, Plaintiffs stated they "have suffered and continue to suffer financial losses and increased data security risks" as a result of the "data breach compromising the PII and PHI associated with approximately two million of Shields' patients," which included "patients' names, dates of birth, home address, provider information, diagnosis, Social Security numbers, billing information, insurance number and information, medical record number, patient ID and other medical or treatment information." Feldman Decl. Ex. A at 1-2. Given the conduct at issue, it "should have been apparent to the defendant" what injuries Plaintiffs would have suffered due to the breach.  *Piccuirro v. Gaitenby*, 480 N.E.2d 30, 34 (Mass. App. Ct. 1985).

Finally, Defendant argues that the relief requested in the Consolidated Demand Letter was too vague.  Plaintiffs requested two distinct forms of relief.  First, Plaintiffs identified five specific measures for Defendant to implement to protect Plaintiffs' PII and PHI.  *See* Feldman Decl. Ex. A at 2-3.  In its response, Defendant conceded that Plaintiffs had requested "that Shields take specify [sic] actions" to remedy the alleged violations, which it declined to do.  *See* Feldman Decl. Ex. B, at 2. Second, Plaintiffs requested that Defendant pay "the costs incurred as a result of Shields' violations." Feldman Decl. Ex. A at 3.  This, too, was sufficient. A written demand "need not specify a dollar amount of damages." *Zabilansky v. Am. Bldg. Restoration Prod., Inc.*, No. 200101985, 2004 WL 2550458, at *14 (Mass. Super. Oct. 13, 2004), *aff'd*, 853 N.E.2d 221

(Mass. App. Ct. 2006). Rather, a written demand need only "permit the defendants reasonably (even if only roughly) to ascertain their exposure…." *Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068, 1076 (Mass. App. Ct. 2006). As a healthcare provider charged with collecting and safeguarding PII and PHI, Defendant was well aware of "the significant costs that would be imposed on Shields' patients as a result of a breach."  ¶ 109.  Defendant was thus fully able to make "an informed damage evaluation" and reasonable settlement offer on the basis of its expertise, the information contained in the complaints and related actions, and, if needed, with an expert's assistance. *Williams v. Perrault*, 976 N.E.2d 214, 2012 WL 4936612, at *1 (Mass. App. Ct. 2012). It chose not to do so. The Court should thus reject Defendant's arguments.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendant's Motion should be denied in its entirety.

Dated:  October 2, 2023                    Respectfully submitted,

                                           **BERMAN TABACCO**


                                           */s/ Nathaniel L. Orenstein_____*

                                           Nathaniel L. Orenstein (BBO #664513)
                                           Patrick T. Egan (BBO #637477)
                                           Christina L. Gregg (BBO #709220)
                                           One Liberty Square
                                           Boston, MA 02109
                                           Telephone: (617) 542-8300
                                           pegan@bermantabacco.com
                                           norenstein@bermantabacco.com
                                           cgregg@bermantabacco.com

Jason M. Leviton (BBO #678331)
Brendan Jarboe (BBO #691414)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jason@blockleviton.com
brendan@blockleviton.com

*Interim Co-Liaison Counsel*

Lori G. Feldman, Esq. *(admitted pro hac vice)*
**GEORGE FELDMAN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (561) 232-6002
Facsimile (888) 421-4173
lfeldman@4-justice.com
E-Service: eService@4-Justice.com

David J. George
**GEORGE FELDMAN MCDONALD, PLLC**
9897 Lake Worth Road, Suite 302
Lake Worth, FL 33467
Telephone: (561) 232-6002
dgeorge@4-justice.com

Elizabeth Pollock-Avery *(admitted pro hac vice)*
Gary F. Lynch *(admitted pro hac vice)*
Hannah N. Barnett *(admitted pro hac vice)*
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile : (412) 231-0246
gary@lcllp.com
elizabeth@lcllp.com
hannah@lcllp.com

Alex Dravillas *(admitted pro hac vice)*
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
ajd@kellerpostman.com

***Interim Co-Lead Counsel***

Stephen R. Basser
**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900,
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com

Melissa R. Emert *(admitted pro hac vice)*
Gary S. Graifman
**KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.**
135 Chestnut Ridge Road Suite 200
Montvale, NJ 07645
Telephone: (201) 391-7000
Facsimile: (201) 307-1086
memert@kgglaw.com
ggraifman@kgglaw.com

Todd. S. Garber (*admitted pro hac vice*)
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 824-1561
tgarber@fbfglaw.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
227 Monroe Street, Suite 2100
Chicago, IL 60606
gklinger@milberg.com

Kenya J. Reddy
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
kreddy@ForThePeople.com

Carey Alexander *(admitted pro hac vice)*
Erin Green Comite *(admitted pro hac vice*)
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
calexander@scott-scott.com
ecomite@scott-scott.com

Victoria Santoro Mair
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Telephone: (617) 391-9001
Facsimile: (617) 357-9001
victoria@sweeneymerrigan.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Telephone: (312) 984-0000
Facsimile: (212) 686-0114
malmstrom@whafh.com

*Interim Executive Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF System will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing.

DATED: October 2, 2023                             */s/ Nathaniel L. Orenstein*
                                                   Nathaniel L. Orenstein